*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 90**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

CAMERON ANDERSON,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20130511
Filed October 28, 2015

On Certiorari to the Utah Court of Appeals

Sixth District, Panguitch
The Honorable Wallace A. Lee
No. 111600101

Attorneys:

Dale W. Sessions, Cedar City, Utah, for appellant

Sean D. Reyes, Att'y Gen., Marian Decker, Asst. Att'y Gen.,
Barry L. Huntington, Panguitch, Utah, for appellee

JUSTICE DURHAM authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
and JUSTICE HIMONAS joined.

JUSTICE PARRISH sat for oral argument. Due to her resignation from
this court, she did not participate herein.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1     Two sheriff's deputies stopped late on a winter evening to check on the welfare of Cameron Anderson, who was parked on the side of a highway with his hazard lights flashing. It turned out that Mr. Anderson was fine before the deputies decided to check on him, but he was less so afterward. As a result of Mr. Anderson's encounter with the deputies, they discovered a small amount of marijuana in his vehicle, and the State subsequently charged him

with criminal possession. The question in this appeal is whether this evidence was obtained in violation of Mr. Anderson's Fourth Amendment rights.

¶2     To answer this question we must resolve two issues. First, we must decide whether the deputies seized Mr. Anderson within the meaning of the Fourth Amendment when they pulled behind his parked vehicle with their police cruiser's red and blue lights flashing. Because we answer in the affirmative, we must then decide whether this seizure was justified as a community caretaking stop. We conclude that the community caretaking doctrine justified the stop under the facts of this case and thus hold that the seizure did not violate the Fourth Amendment.

## BACKGROUND

¶3     Around 10:00 p.m. on a cold late-December evening, Mr. Anderson pulled his car over to the side of a rural highway and turned on his hazard lights. Two Garfield County sheriff's deputies noticed Mr. Anderson's hazard lights while they were driving down the highway. Because of the hazard lights, the cold weather, and the late hour, the deputies decided to stop and check on the welfare of any occupants of the vehicle. As the deputies pulled over to the side of the road behind Mr. Anderson's vehicle, they engaged the red and blue lights on their police vehicle.

¶4     The deputies left their vehicle and approached Mr. Anderson. When the deputies made contact with Mr. Anderson to ask whether he needed assistance, they noticed that his eyes appeared to be bloodshot. Also, Mr. Anderson, who lived in another state, was not sure what direction he was travelling in at the time. The deputies asked Mr. Anderson to exit his car, and he complied. He did not sway or move in a suspicious manner. The deputies asked Mr. Anderson to empty his pockets and he produced a pill bottle with a valid prescription. Mr. Anderson declined the deputies' request to complete a field sobriety test, but he agreed to a blood draw to test for illegal substances.

¶5     The deputies obtained a warrant authorizing them to arrest Mr. Anderson, obtain blood or urine from him, and search his vehicle. Testing of blood obtained from Mr. Anderson revealed no illegal substances in his system. A search of his vehicle, however, yielded marijuana and drug paraphernalia.

¶6     The State charged Mr. Anderson with possession of less than an ounce of marijuana and possession of drug paraphernalia. In a pretrial motion, Mr. Anderson moved to suppress the evidence obtained from his vehicle. The district court concluded that

Mr. Anderson had been seized by the deputies when they pulled behind his parked vehicle with blue and red flashing lights. But the court ruled that the stop was justified by the community caretaking doctrine and denied the motion to suppress.

¶7     A jury subsequently found Mr. Anderson guilty of possessing marijuana and drug paraphernalia. He filed this appeal and argued in his briefing to this court that the district court erred when it denied his motion to suppress the evidence obtained from his vehicle. We review the district court's Fourth Amendment ruling de novo. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699 (adopting a nondeferential standard of review for search and seizure cases); *Salt Lake City Corp. v. Labor Comm'n*, 2007 UT 4, ¶ 15 n.1, 153 P.3d 179.

## ANALYSIS

¶8     Absent an exception to the exclusionary rule, evidence obtained in violation of the Fourth Amendment's protections against unreasonable searches and seizures should be excluded. *Davis v. United States*, 131 S. Ct. 2419, 2426–28 (2011); *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *State v. Strieff*, 2015 UT 2, ¶¶ 15–19, 357 P.3d 532. Mr. Anderson argues that the sheriff's deputies violated his Fourth Amendment rights when they seized his vehicle without sufficient justification. He further contends that the warrant and subsequent search of his vehicle that yielded the marijuana and drug paraphernalia evidence were a direct result of this unconstitutional seizure. Mr. Anderson therefore asserts that the district court should have excluded the evidence as a fruit of a police seizure that violated his Fourth Amendment rights.

¶9     In examining Mr. Anderson's claims, we must first determine whether the deputies effected a seizure by pulling behind his parked vehicle with their cruiser's red and blue lights flashing. Because we determine that Mr. Anderson was seized, we next decide whether this seizure was justified by the community caretaking doctrine.

## I. POLICE SEIZURE OF MR. ANDERSON'S VEHICLE

¶10    There can be no violation of the Fourth Amendment's prohibition against unreasonable seizures in the absence of an actual seizure executed by a state actor. *United States v. Drayton*, 536 U.S. 194, 200–01 (2002). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, '"by means of physical force or show of authority,"' terminates or restrains his freedom of movement . . . ." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citation omitted). A show of authority is sufficient to constitute a

seizure if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 255 (citation omitted). Thus it is a hypothetical reasonable person's interpretation of an officer's actions—not the officer's intent—that determines whether an individual has been seized by an officer through a show of authority.

¶11 The question presented here is whether a reasonable person parked on the side of an empty highway at night would believe that she was free to leave if a police vehicle with its red and blue overhead lights engaged pulled over directly behind her car. The State argues that a reasonable person in this situation would feel free simply to drive away. In support of this contention, the State correctly notes that a police vehicle's overhead lights are not always used as a show of authority. They may be used for officer or public safety and to convey to the occupants of a vehicle that the approaching officer does not present a threat. The State contends that a reasonable motorist in the circumstances of this case would know that a police officer was using the overhead lights for safety purposes and not as a show of authority meant to detain the motorist.

¶12 The State supports this argument by citing a terse Minnesota Supreme Court opinion, *State v. Hanson*, 504 N.W.2d 219 (Minn. 1993). In that case, the court held that a police officer did not seize a car parked on the shoulder of a highway at night when the officer pulled behind the vehicle with the police car's flashing red lights engaged, reasoning that a reasonable person would know that the officer's lights were being used for safety purposes. *Id.* at 219–20.

¶13 But most courts that have examined whether police have seized a parked vehicle under similar circumstances have agreed with the Kansas Supreme Court that "[f]ew, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something other than for them to remain." *State v. Morris*, 72 P.3d 570, 577 (Kan. 2003) (citation omitted); *see also id.* at 578 (noting that "most appellate courts considering the issue have concluded a seizure occurs when the officer activates emergency lights" behind a parked car and collecting cases from Arkansas, California, Connecticut, Florida, Maryland, Oregon, Tennessee, Vermont, Virginia, and Washington); *People v. Cash*, 922 N.E.2d 1103, 1114 (Ill. App. Ct. 2009) ("[W]e note that the cases are legion in other jurisdictions in which the activation of lights or siren or both has been deemed a sufficient show of authority to result in the seizure of a parked car."). The Utah Court of Appeals has similarly held that an officer parked behind a vehicle on the side of a road "detained [the

motorist] by a display of authority when he activated the overhead lights on his vehicle." *State v. Davis*, 821 P.2d 9, 12 (Utah Ct. App. 1991).

¶14 We agree with the court of appeals and the majority of courts that have held that an officer's use of overhead lights behind a vehicle parked on the side of the road may constitute a seizure. Even though we may presume that a reasonable person knows that police officers may use their overhead lights for reasons other than as a command to stop, that does not mean that the average motorist under the facts of this case would assume that the officers had no interest in detaining the vehicle and would feel free to drive away. At best, the use of a police vehicle's overhead lights while pulling behind a car parked on the side of the road is ambiguous. The lights may signal the presence of a police vehicle for safety reasons, or they may convey the message that the officers wish to seize the vehicle parked in front of them. Faced with this ambiguity, "[f]ew, if any, reasonable citizens, while parked, would simply drive away" upon an assumption that the police did not wish to detain them. *Morris*, 72 P.3d at 577 (citation omitted). The consequences of wrongly guessing the officer's intent in engaging the overhead lights and driving away could, in theory, be severe. Attempting "to flee or elude a peace officer" after receiving "a visual or audible signal from a peace officer to bring the vehicle to a stop" is a third-degree felony. UTAH CODE § 41-6a-210(1). The potential of even being accused of a felony would constrain a reasonable motorist from driving away under the facts of this case. *See Morris*, 72 P.3d at 577 (citing Kansas's fleeing-an-officer statute as a reason why a reasonable person would not feel free to leave); *Lawson v. State*, 707 A.2d 947, 951 (Md. Ct. Spec. App. 1998) (citing a Maryland statute for the same purpose).

¶15 We note that the question of whether a reasonable person would feel free to leave turns on the particular circumstances of each case. Under the specific facts presented here—where an officer engages overhead flashing lights while pulling directly behind a car parked on the side of a highway—we find that the sheriff's deputies seized Mr. Anderson. We therefore must determine whether this seizure was justified under the Fourth Amendment.

## II. THE COMMUNITY CARETAKING DOCTRINE

¶16 The U.S. Supreme Court first relied upon a police officer's community caretaking function to justify a search of a vehicle in *Cady v. Dombrowski*, 413 U.S. 433 (1973). In that case, the Court held that police officers did not violate the Fourth Amendment when they searched the trunk of a parked car because they reasonably believed that the trunk contained a loaded gun that could endanger the public

if it fell into the wrong hands. *Id.* at 447–48. The Court reasoned that police officers "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441.

¶17    Although the Supreme Court has not yet addressed the question of whether a police officer's community caretaking duties may also justify the seizure of a vehicle to ensure the safety of the occupants, many state courts have held that these duties may justify such a seizure in appropriate circumstances.  *Rowe v. State*, 769 A.2d 879, 890 (Md. 2001) (collecting cases); *State v. Smathers*, 753 S.E.2d 380, 384 (N.C. Ct. App. 2014) ("Since the Supreme Court's decision in *Cady,* a large majority of state courts have recognized the community caretaking doctrine as a valid exception to the warrant requirement of the Fourth Amendment."). The leading case in Utah on this subject is the court of appeals opinion in *Provo City v. Warden*, 844 P.2d 360 (Utah Ct. App. 1992). In that case, the court of appeals held that the seizure of a vehicle is justified by the community caretaking doctrine if (1) "a reasonable officer [would] have stopped a vehicle for a purpose consistent with community caretaker functions" under the circumstances *and* (2) "based upon an objective analysis, . . . the circumstances demonstrate an imminent danger to life or limb." *Id.* at 364. Upon certiorari review, this court agreed with the reasoning and the result of the court of appeals opinion, effectively endorsing the community caretaking standard adopted by it. *Provo City v. Warden*, 875 P.2d 557, 557 (Utah 1994).

¶18    The State argues that the "imminent danger to life or limb" portion of the standard adopted in the *Warden* case is unduly restrictive and should be overruled. Thus, the first question before this court is whether the *Warden* "life or limb" standard should stand. Because we conclude that subsequent U.S. Supreme Court opinions have fatally undermined the *Warden* standard, we abandon it. We therefore articulate a new community caretaking standard and apply this new standard to the facts of this case.

   A.  *The Continuing Validity of the* Warden *"Life or Limb" Standard*

¶19    As noted above, the U.S. Supreme Court has not yet applied the community caretaking doctrine to police stops of motorists. But it has applied a similar doctrine—the emergency aid doctrine—to justify an officer's warrantless entry into a home.

¶20    In *Brigham City v. Stuart*, for example, officers observed an altercation in a house through a screen door and windows. 547 U.S. 398, 401 (2006). The officers saw an individual strike another in the

face, causing the victim of the blow to spit blood into a sink. *Id.* Several other individuals then restrained the aggressor by pinning him to a refrigerator. *Id.* The officers then entered the home in order to restore order and to ascertain whether the victim needed assistance. *Id.* The Supreme Court held that the warrantless entry was justified because under the emergency aid doctrine "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* at 403.

¶21 Although a perceived or threatened injury must be "serious" to justify the application of the emergency aid doctrine, *id.* ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."); *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (warrantless entry justified to "avoid serious injury" (citation omitted)), the injury need not be life-threatening. In *Michigan v. Fisher*, for example, officers observed through a window that a man was screaming and throwing things in his own home. 558 U.S. 45, 46 (2009) (per curiam). The officers saw that the man had a cut on his hand and asked him whether he needed medical attention, but the man ignored the officers' inquiries "and demanded, with accompanying profanity, that the officers go to get a search warrant." *Id.* One of the officers then entered the home without the requested warrant. *Id.* Under these facts, the Supreme Court rejected the Michigan Court of Appeals' reasoning that the cut hand was not serious enough to justify an officer's uninvited and warrantless entry into the home. *Id.* at 48–49. Noting that "[t]he only injury police could confirm in *Brigham City* was [a] bloody lip," the Court held that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id.* at 49. Instead, "[i]t sufficed to invoke the emergency aid exception that it was reasonable to believe that [the man with the cut hand] had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide." *Id.*

¶22 Both *Brigham City* and *Fisher* undermine the "life or limb" standard this court endorsed in *Warden*. In *Brigham City*, a bloody lip coupled with the potential for further fist fighting justified a warrantless entry into a home. In *Fisher*, a cut hand was sufficient. Neither of these cases involved an "imminent danger to life or limb" that the Utah Court of Appeals held was required to justify a community caretaking stop. *See Warden*, 844 P.2d at 364. This incongruence between Utah and Supreme Court precedent regarding the closely related community caretaking doctrine and the

emergency aid doctrine casts considerable doubt on the continuing validity of the *Warden* standard.

¶23    Granted, *Brigham City* and *Fisher* involved warrantless entries into a home, while *Warden* dealt with the justification needed to temporarily seize a motorist. But this distinction does not justify more robust restrictions on an officer's ability to seize a motorist than on an officer's ability to enter a home without a warrant. To the contrary, "less stringent warrant requirements have been applied" to the search and seizure of automobiles than to the search of a home or office. *Cardwell v. Lewis*, 417 U.S. 583, 589–90 (1974). Consequently, a lesser showing of reasonable, articulable suspicion is required to stop a motorist, while a greater showing of probable cause is required for a police officer to enter and search a home. *State v. Applegate*, 2008 UT 63, ¶ 9, 194 P.3d 925 (a police officer's "reasonable, articulable suspicion" of criminal activity is necessary for an investigatory stop of a vehicle); *Johnson v. United States*, 333 U.S. 10, 13–14 (1948) (a probable cause finding by "a neutral and detached magistrate" is required for a warrant to search a residence); *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (when courts make reasonable-suspicion determinations, "the likelihood of criminal activity need not rise to the level required for probable cause"). Because less justification is required to temporarily seize a motorist than to enter and search a home, it makes little sense for Utah to maintain a more stringent standard for police to stop a motorist for public safety reasons than the standard the Supreme Court has articulated for police to enter a home without a warrant for similar reasons.

¶24    We therefore conclude that the "life or limb" standard this court effectively endorsed in 1994 is out of step with subsequent Supreme Court precedent closely related to the community caretaking doctrine. Thus, we abandon the *Warden* "life or limb" standard and articulate a new standard for determining whether a seizure of a vehicle for community caretaking purposes violates the Fourth Amendment.

*B. The Community Caretaking Standard for Seizing a Motorist and the Application of this Standard to this Case*

¶25    The Fourth Amendment does not prohibit all police seizures. It forbids only "unreasonable" seizures. U.S. CONST. amend. IV. Thus, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness'" of the seizure. *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (citation omitted). "The reasonableness of a seizure under the Fourth Amendment is determined 'by balancing its intrusion on the individual's Fourth

Amendment interests against its promotion of legitimate government interests.'" *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 187–88 (2004) (citation omitted); *accord Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[T]here is 'no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails.'" (citation omitted)). Greater intrusions upon an individual's freedom of movement require a concomitant greater showing of a legitimate government interest to justify the intrusion, while a lesser intrusion may be justified by a lesser showing of a government interest. That is why a highly intrusive arrest requires probable cause, while a less intrusive *Terry* stop requires a less stringent reasonable suspicion standard. *Arvizu*, 534 U.S. at 273; *Terry*, 392 U.S. at 21, 24–27.

¶26   This balancing between an individual's interest in being free from police intrusions and the State's legitimate interest in the public welfare that underpins a court's scrutiny of a seizure based upon suspicion of criminal activity also animates the community caretaking doctrine. *Provo City v. Warden*, 844 P.2d 360, 363 (Utah Ct. App. 1992) (seizure of a motorist for community caretaking reasons requires "the balancing between the legitimate governmental interest in aiding a motorist and an individual's right to be free from arbitrary interferences from law enforcement officers"). In applying this balancing test in the context of a community caretaking stop, courts must first evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy. In doing so, courts should look to both "the degree of overt authority and force displayed" in effecting the seizure, *id.* at 364 (citation omitted), and the length of the seizure. Second, courts must determine whether "the degree of the public interest and the exigency of the situation" justified the seizure for community caretaking purposes. *Id.* (citation omitted). In other words, how serious was the perceived emergency and what was the likelihood that the motorist may need aid? If the level of the State's interest in investigating whether a motorist needs aid justifies the degree to which an officer interferes with the motorist's freedoms in order to perform this investigation, the seizure is not "unreasonable" under the Fourth Amendment.

¶27   Under the first step of this inquiry, we determine that the deputies' seizure of Mr. Anderson vehicle was minimally invasive of his "right to be free from arbitrary interferences from law enforcement officers." *See id.* at 363. Mr. Anderson was parked, rather than traveling down the highway, when he was seized, lessening (although not entirely eliminating) the deputies' interference with his right to go about his business without

unnecessary police intrusions. Additionally, the "degree of overt authority and force displayed" was not unduly excessive. *See id.* at 364 (citation omitted). The show of authority through the use of the flashing overhead lights was minimal. The deputies did not, for example, approach with weapons drawn or while shouting commands. Finally, the officers detained Mr. Anderson for community caretaking purposes only long enough to approach his vehicle and ask whether he needed aid.[1]

¶28 Evaluating the second step of the community caretaking inquiry—the seriousness of the perceived emergency and the likelihood that the motorist needs aid—under the facts of this case, we conclude that a reasonable officer would have cause to be concerned about the welfare of a motorist in Mr. Anderson's situation. Mr. Anderson was parked on the side of highway with his hazard lights flashing just before 10:00 p.m. Because it was late December, it was dark and very cold. Although the district court did not make a finding of fact regarding the precise temperature, it noted that the State indicated that it was 7 degrees below zero and that defense counsel agreed.

---

[1] We emphasize that for the purpose of applying the community caretaking doctrine to the facts of this case, we evaluate only the period of time from the initial seizure up until when the deputies approached his vehicle and asked whether he required assistance. Once the deputies engaged in conversation with Mr. Anderson, they noticed that his eyes appeared to be bloodshot and that he did not know in which direction he was travelling. At this point, the deputies became suspicious that Mr. Anderson was driving under the influence of an illegal substance, and the nature of the detention changed from a community caretaking stop to an investigatory detention. Upon further investigation, the deputies then believed that they had probable cause to arrest Mr. Anderson and search his vehicle, which led to the marijuana and drug paraphernalia evidence. Each successive stage of the deputies' investigation must independently meet the reasonableness requirement imposed by the Fourth Amendment. And as the infringements upon Mr. Anderson's freedoms increased—from a brief community caretaking stop to a longer investigatory detention and, finally, a warrant authorizing his arrest and the search of his vehicle—the degree of governmental interest required to justify the infringement likewise increased. Because Mr. Anderson did not challenge the investigatory detention or the warrant in this appeal, we confine our analysis to the community caretaking stop.

¶29    A motorist may have many motivations for pulling to the side of a highway and engaging hazard lights, ranging from the mundane to the life-threatening. The motorist could be lost, disciplining rowdy children, sleeping, or answering a cell phone call. But there is also a good chance that the motorist has run out of gas, has mechanical problems, or, worse, is experiencing a medical emergency. The fact that it is very cold and dark would exacerbate the duress of a motorist in need of aid. Given the decent odds that a motorist in this situation may need help, an officer would have reason to be concerned and to at least stop to determine whether assistance is needed.

¶30    Weighing the minimal interference with Mr. Anderson's freedom of movement occasioned by the deputies' brief seizure against the State's interest in determining whether any occupants of the vehicle required aid under these circumstances, we determine that the community caretaking doctrine justified the seizure. In so doing, we balance an officer's laudable impulse to assist the public against a citizen's important constitutional right to be free from unreasonable seizures. In this case, we determine that Mr. Anderson's seizure was a reasonable exercise of the deputies' community caretaking function and affirm the district court's ruling that the deputies' acquisition of the marijuana and drug paraphernalia was not the fruit of a violation of his Fourth Amendment rights. We therefore affirm Mr. Anderson's conviction.