HARRIS, Judge:
 

 ¶1 Brett Thomas Smith fell asleep in his car in a McDonald's parking lot in the wee hours of the morning, and refused to leave the premises even after he was asked to do so. Police soon arrived, and in the process of waking him up detected alcohol on his breath. Smith was later charged with driving under the influence (DUI), and moved to suppress all evidence discovered that night on the ground that he was unreasonably seized in violation of the United States Constitution. The district court denied that motion, determining that the seizure was justified by the community caretaking doctrine. Smith appeals that decision, and we affirm.
 

 BACKGROUND
 

 ¶2 In the wee hours of a cold December morning in 2016, several employees of a McDonald's restaurant in West Valley City, Utah noticed that a man-who was later identified as Smith-appeared to be asleep in his car, which was parked in the restaurant's parking lot with the motor running. The restaurant's shift manager (Manager) went out to the parking lot and attempted to wake Smith and tell him that he needed to leave, but Smith did not respond to verbal entreaties. Manager then knocked on the car's window and was finally able to rouse Smith and asked him to leave the premises. Smith then pulled out of the parking spot, drove around the building, and re-parked in the same parking lot. Manager then informed his co-manager that Smith had not left the premises as requested, and one of them notified the police.
 
 [1]
 

 ¶3 Police officers responded to the scene after receiving a dispatch call that a welfare check was needed at McDonald's. Specifically, the dispatch call notes mentioned that there was a "male, slumped over the wheel, [who] appeared to be sleeping," and the first officer (First Officer) to arrive on the scene later testified that the dispatch call he received informed him that "an individual ... was driving their car around the parking lot multiple times, and then had fallen asleep at the wheel in a parking stall."
 
 [2]
 
 When First Officer arrived, he immediately located the vehicle in question, and noticed that "the vehicle was on and running." Based on all of the information he had, First Officer made the decision to park behind Smith's vehicle in such a way that would have made it difficult for Smith to exit the parking stall, and waited for other officers before making contact. As he waited, First Officer observed that Smith was "hunched over the center console," and that he was "not awake." In addition, First Officer shined a spotlight on Smith's car to ascertain whether Smith was its only occupant. When the next officer (Second Officer) arrived on scene, he observed a parked car with its motor running in which a male occupant was slumped over the wheel, apparently asleep. Second Officer parked his patrol car alongside Smith's vehicle. Either First Officer or Second Officer was accompanied by a third officer; in total, three police officers were on scene.
 

 ¶4 All three officers exited their vehicles, and approached Smith's vehicle. As they did so, they were wearing their typical police gear, but they never activated the emergency lights on their police vehicles, and there is no
 indication in the record that any of the officers ever unholstered any weapon. The officers knocked on Smith's car window multiple times in an attempt to wake him. When Smith eventually awoke, the officers asked him to open his door, and he complied.
 

 ¶5 Once the door was opened, the officers "smell[ed] the odor of alcohol on [Smith's] breath." Second Officer asked Smith to step out and perform field sobriety tests, and Smith complied. The results of the tests indicated that Smith was likely intoxicated. Second Officer also learned, upon checking Smith's driver license in a database, that Smith's license had been revoked. The officers arrested Smith and read him his
 
 Miranda
 

 [3]
 
 rights, after which Smith admitted that he had consumed enough alcohol to make him believe that he was over the legal limit. The officers took Smith to the West Valley City police station where they administered a breathalyzer test, which indicated that Smith's blood-alcohol content was .135, well over the legal limit. Smith was later charged with driving under the influence of alcohol with prior convictions, a third-degree felony; operating a vehicle as an alcohol restricted driver, a class B misdemeanor; and driving on a suspended or revoked license, a class B misdemeanor.
 

 ¶6 Smith filed a motion to suppress his statements as well as the results of the field sobriety and breathalyzer tests, alleging that the evidence was obtained by virtue of an illegal seizure. Smith asserted that the facts did not justify the seizure, arguing that the officers did not have probable cause or reasonable suspicion to believe a crime had been committed. After an evidentiary hearing, the district court denied Smith's motion, ruling that, although the officers had indeed seized Smith, the seizure was justified under the community caretaking doctrine.
 

 ¶7 Following the court's denial of his motion to suppress, Smith entered a conditional guilty plea
 
 [4]
 
 to the felony DUI charge, and the State agreed to dismiss the remaining counts. As part of his conditional plea, Smith retained his right to appeal the denial of his motion to suppress, which right Smith now exercises by challenging that decision on appeal.
 

 ISSUE AND STANDARD OF REVIEW
 

 ¶8 "We review a [district] court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact."
 
 State v. Fuller
 
 ,
 
 2014 UT 29
 
 , ¶ 17,
 
 332 P.3d 937
 
 . Under this standard, "[w]hile the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case."
 

 Id.
 

 ANALYSIS
 

 ¶9 The Fourth Amendment to the United States Constitution "does not prohibit all police seizures."
 
 State v. Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 25,
 
 362 P.3d 1232
 
 . Instead, it prohibits only "unreasonable" seizures.
 
 See
 
 U.S. Const. amend. IV (stating that citizens have a right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"). In this case, the parties do not contest the fact that the officers seized Smith in the McDonald's parking lot. The question presented in this case, then, is whether that seizure was reasonable. Smith argues that his seizure was unreasonable and therefore unconstitutional, and that the evidence discovered pursuant to that seizure must be excluded.
 
 See
 

 Mapp v. Ohio
 
 ,
 
 367 U.S. 643
 
 , 660,
 
 81 S.Ct. 1684
 
 ,
 
 6 L.Ed.2d 1081
 
 (1961) (determining that evidence obtained in violation of the Fourth Amendment would be excluded from a defendant's criminal trial). The State, by contrast, asserts that the officers' seizure of Smith was reasonable, and justified by the community caretaking doctrine. We agree with the State.
 

 ¶10 "The reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests."
 
 Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 25,
 
 362 P.3d 1232
 
 (quotation simplified). "Greater intrusions upon an individual's freedom of movement require a concomitant greater showing of a legitimate government interest to justify the intrusion, while a lesser intrusion may be justified by a lesser showing of a government interest."
 

 Id.
 

 For these reasons, "a highly intrusive arrest requires probable cause, while a less intrusive
 
 Terry
 
 stop requires a less stringent reasonable suspicion standard."
 

 Id.
 

 (referring to
 
 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 , 21, 24-27,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968) ).
 

 ¶11 In one attempt to strike the appropriate balance, the United States Supreme Court has articulated the community caretaking doctrine.
 
 See
 

 Cady v. Dombrowski
 
 ,
 
 413 U.S. 433
 
 , 447-48,
 
 93 S.Ct. 2523
 
 ,
 
 37 L.Ed.2d 706
 
 (1973) ;
 
 see also
 

 Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 26,
 
 362 P.3d 1232
 
 (stating that "[t]his balancing between an individual's interest in being free from police intrusions and the State's legitimate interest in the public welfare ... animates the community caretaking doctrine"). In
 
 Cady
 
 , the Court held that police officers' warrantless search of the trunk of a parked car did not violate the Fourth Amendment because the officers reasonably believed that the trunk contained a loaded gun that could endanger the public if it fell into the wrong hands.
 
 413 U.S. at 447-48
 
 ,
 
 93 S.Ct. 2523
 
 . The Court stated that officers "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."
 

 Id.
 

 at 441
 
 ,
 
 93 S.Ct. 2523
 
 .
 

 ¶12 Our supreme court-like many other state courts-has applied the community caretaking doctrine to "justify the seizure of a vehicle to ensure the safety of the occupants."
 
 Anderson
 
 ,
 
 2015 UT 90
 
 , ¶¶ 17, 30,
 
 362 P.3d 1232
 
 (citing other state courts that recognize the doctrine, and holding "that the community caretaking doctrine justified the seizure" of a vehicle to determine "whether any occupants of the vehicle required aid"). In
 
 Anderson
 
 , the court articulated a two-part test to be applied in determining whether the community caretaking doctrine reasonably justifies a seizure. First, "courts must ... evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy."
 
 Id.
 
 ¶ 26. In evaluating this first factor, "courts should look to both the degree of overt authority and force displayed in effecting the seizure, and the length of the seizure."
 
 Id.
 
 (quotation simplified). Second, "courts must determine whether the degree of the public interest and the exigency of the situation justified the seizure for community caretaking purposes."
 
 Id.
 
 (quotation simplified). In evaluating this second factor, courts should evaluate the seriousness of the "perceived emergency," along with "the likelihood that the motorist may need aid."
 
 Id.
 
 After evaluating these factors, "[i]f the level of the State's interest in investigating whether a motorist needs aid justifies the degree to which an officer interferes with the motorist's freedoms in order to perform this investigation, the seizure is not 'unreasonable' under the Fourth Amendment."
 
 Id.
 

 ¶13 In
 
 Anderson
 
 , two law enforcement officers on patrol on a cold late-December evening noticed a car pulled over on the side of a rural highway with its hazard lights flashing.
 
 Id.
 
 ¶ 3. "Because of the hazard lights, the cold weather, and the late hour, the deputies decided to stop and check on the welfare of any occupants of the vehicle."
 
 Id.
 
 To this end, they turned their flashing lights on and pulled up behind the parked car, then exited their vehicle and approached the parked car on foot.
 
 Id.
 
 ¶¶ 3-4. When the officers made contact with the occupant of the vehicle, they noticed that his eyes appeared bloodshot and that he was unable to tell them which direction he was going.
 
 Id.
 
 ¶ 4. Eventually, the officers obtained a warrant authorizing them to arrest the occupant and search his vehicle, and upon executing that search the officers found marijuana and drug paraphernalia.
 
 Id.
 
 ¶ 5. After being charged with drug crimes, the occupant moved to suppress the evidence discovered in his vehicle, alleging the initial
 actions of the officers constituted an unreasonable seizure, but the district court denied the motion, ruling that the stop was justified by the community caretaking doctrine.
 
 Id.
 
 ¶ 6. Our supreme court affirmed, concluding that both parts of the test weighed in favor of application of the doctrine.
 
 Id.
 
 ¶ 30. First, the court determined that the seizure was only minimally invasive, because the occupant "was parked, rather than traveling down the highway, when he was seized," thereby "lessening" the officers' interference with his freedom of movement, and because the officers' "show of authority ... was minimal."
 
 Id.
 
 ¶ 27. Second, the court determined that, "[b]ecause it was late December" and "dark and very cold," "a reasonable officer would have cause to be concerned about the welfare of a motorist in [the occupant's] situation."
 
 Id.
 
 ¶ 28.
 

 ¶14 When we apply
 
 Anderson
 
 's two-part test to the facts of this case, we conclude that the seizure of Smith in the McDonald's parking lot was justified by the community caretaking doctrine. First, the officers in this case were motivated by the same purposes as the officers in
 
 Anderson
 
 -checking on the welfare of an occupant of a parked car on a cold night-and the officers carried out the welfare check in a similar and minimally invasive manner. Although the officers positioned their vehicle in such a way that Smith could not easily drive away, Smith was already parked and asleep in the driver's seat, and was not intending to go anywhere anytime soon.
 
 See
 

 id.
 
 ¶ 27 (stating that the occupant "was parked ... when he was seized, lessening ... the deputies' interference with his right to go about his business"). In addition, the officers here-unlike those in
 
 Anderson
 
 -did not activate their emergency lights, and-similar to those in
 
 Anderson
 
 -did not draw their weapons. Finally, the initial seizure was brief, lasting only long enough for the officers to make sure that Smith did not pose a threat to himself or others.
 
 [5]
 

 Compare id.
 
 (finding a seizure minimally invasive, given the purpose of the welfare check, because the occupant was parked, the officers' weapons were not drawn, and the seizure was only long enough for the officer to approach and ask whether the occupant needed aid),
 
 with
 

 United States v. King
 
 ,
 
 990 F.2d 1552
 
 , 1562-63 (10th Cir. 1993) (finding a seizure overly invasive and unreasonable where the actions taken by the officers-approaching the occupant of the vehicle with guns drawn and ordering the individual to put his hands on the steering wheel or be shot-were disproportionate and unnecessary to accomplish the purpose of the welfare check).
 

 ¶15 Second, the nature of the "public interest and the exigency of the situation" is similar to
 
 Anderson
 
 .
 
 [6]
 

 2015 UT 90
 
 , ¶ 26,
 
 362 P.3d 1232
 
 (quotation simplified). In both
 cases, officers were motivated by a concern for the safety of an occupant of a parked vehicle in the late hours of a cold December night, and in this case the officers were also motivated by a concern for the safety of members of the community. Indeed,
 
 Cady
 
 instructs us that the community caretaking doctrine may be motivated not just by a concern for the individual involved, but also for members of the community who might be in danger.
 
 See
 

 413 U.S. at 447-48
 
 ,
 
 93 S.Ct. 2523
 
 (applying the community caretaking doctrine where police officers conducted a warrantless search of the trunk of a parked car because they reasonably believed that the trunk contained a loaded gun that could endanger the public if it fell into the wrong hands). Here, the officers testified that they were concerned that the driver might have been "unconscious or not breathing," or that, because the car was running, the driver might "hit[ ] the gas" and go "backwards," thereby endangering others. Moreover, in this case, the officers were not acting of their own accord; they were responding to a 911 call from a concerned citizen. Officers in situations like this are entitled to rely on information received from citizens that is passed to them through a dispatch call.
 
 See
 

 State v. Roybal
 
 ,
 
 2010 UT 34
 
 , ¶¶ 14-16,
 
 232 P.3d 1016
 
 .
 

 ¶16 Smith argues that some of the additional facts that the officers learned-including the fact that Smith was asleep at the wheel of a running car, and had earlier been seen driving around the parking lot before re-parking-became known to them only after they had already seized Smith, and therefore cannot be used to justify the seizure. This contention, however, is not supported by the record. One of the officers specifically testified that "dispatch had received a call from McDonald's employees that an individual ... was driving their car around the parking lot multiple times, and then had fallen asleep at the wheel in a parking stall." And First Officer testified that he observed that the car was running before parking behind Smith.
 
 [7]
 

 ¶17 Next, Smith asserts that the officers in this case acted with too much force, arguing that three officers and two squad cars was too strong a showing of police authority under the circumstances. While law enforcement may well have been able to handle this situation with one officer who parked alongside (rather than behind) Smith, we are not persuaded that the officers' show of force was so excessive here as to render the community caretaking doctrine inapplicable. The officers did not initiate their flashing lights, and did not draw their weapons; instead, they approached Smith's vehicle, knocked on the window, and asked to speak with him.
 

 ¶18 Finally, Smith asserts that the nature of the emergency in this case was not as acute as that presented in
 
 Anderson
 
 . Perhaps this is true. Perhaps a vehicle on the side of a rural highway with its flashers on signals a higher-level emergency-at least for the occupant of the vehicle-than does a vehicle parked in a restaurant parking lot in the middle of the night. But we cannot say
 that this situation presented no emergency; indeed, the officers were justifiably concerned with Smith's well-being, as well as the safety of other restaurant patrons who may encounter Smith's vehicle.
 

 ¶19 In the end, we cannot meaningfully distinguish this case from
 
 Anderson
 
 , and we believe that
 
 Anderson
 
 compels the result in this case. Just as in
 
 Anderson
 
 , we "determine that the community caretaking doctrine justified the seizure," because the officers' "brief seizure" of Smith brought about only "minimal interference with [Smith's] freedom of movement," and because the State had a compelling "interest in determining whether any occupants of the vehicle required aid under these circumstances."
 
 See
 

 2015 UT 90
 
 , ¶ 30,
 
 362 P.3d 1232
 
 ;
 
 see also
 

 In re Clayton
 
 ,
 
 113 Idaho 817
 
 ,
 
 748 P.2d 401
 
 , 402 (1988) (determining that a seizure was justified by the community caretaking doctrine where a police officer observed "a vehicle in a parking lot adjacent to a bar" at "1:30 in the morning," the vehicle's "engine was running," and an individual "was sitting in the driver's seat behind the steering wheel, with his head slumped forward").
 

 CONCLUSION
 

 ¶20 The officers' brief seizure of Smith was not unreasonable, because both parts of the community caretaking doctrine test are satisfied here. In this case, the level of the State's interest in investigating whether Smith needed aid justified the rather minimal degree to which the officers briefly and unobtrusively interfered with Smith's freedom of movement.
 
 See
 

 Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 26,
 
 362 P.3d 1232
 
 . Accordingly, the evidence discovered subsequent to Smith's brief seizure "was not the fruit of a violation of his Fourth Amendment rights."
 
 Id.
 
 ¶ 30.
 

 ¶21 Affirmed.
 

 The State has not argued, either before the district court or on appeal, that the officers had probable cause (or reasonable suspicion) to detain Smith on account of his refusal to leave the McDonald's parking lot after being asked to do so. Accordingly, we have no occasion to consider that issue.
 
 Cf.
 

 State v. Malloy
 
 ,
 
 2019 UT App 55
 
 , ¶ 6 n.2,
 
 441 P.3d 756
 
 (declining to consider whether the community caretaking doctrine applied to the facts of the case, because reasonable suspicion was present for other reasons).
 

 Indeed, the district court found that "[i]t was reported that [Smith] was sleeping in his car, in the middle of the night, in the middle of winter, with the car running, in the parking lot of a restaurant that was open 24 hours." Smith does not challenge that factual finding.
 

 See
 

 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 , 468-69,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966).
 

 With the consent of the prosecution and the approval of the judge, a defendant may enter a conditional guilty plea, while "preserv[ing] [a] suppression issue for appeal."
 
 State v. Sery
 
 ,
 
 758 P.2d 935
 
 , 938-40 (Utah Ct. App. 1988),
 
 disagreed with on other grounds by
 

 State v. Pena
 
 ,
 
 869 P.2d 932
 
 (Utah 1994). "A defendant who prevails on appeal [after entering a conditional plea] shall be allowed to withdraw the plea." Utah R. Crim. P. 11(j).
 

 The dissent finds
 
 Anderson
 
 distinguishable, largely on the basis that (a) in this case, "[t]hree officers and two squad cars" approached Smith, whereas in
 
 Anderson
 
 only two officers in one squad car were on scene; (b) in this case, the officers "completely surrounded Smith, blocking any chance of escape," whereas in
 
 Anderson
 
 the officers detained the individual by pulling up behind his car and turning on their flashing lights; (c) in this case, the officers shined a spotlight on Smith's car, while the
 
 Anderson
 
 opinion does not describe spotlights or flashlights; and (d) in this case, the first officer to arrive on scene
 
 "waited for backup." Compare
 

 infra
 
 ¶ 30,
 
 with
 

 State v. Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 3,
 
 362 P.3d 1232
 
 . We acknowledge these differences between our case and
 
 Anderson
 
 , but we do not find them material. In both cases, the officers were motivated by the same purpose: checking on the welfare of the occupant of a parked car on a cold winter night. We cannot see any sense in a legal rule proclaiming that the use of three officers to conduct that kind of welfare check is too many, but the use of two officers is just fine. We see no meaningful distinction between an officer parking behind a parked car to cut off its escape, on the one hand, and an officer pulling up behind a parked car with lights flashing, on the other; in both cases, the officer has used his vehicle to command the individual to remain in place, and in neither case is the detained individual free to go. And we are not willing to fault officers, who are responding to a potentially dynamic situation, for taking precautions such as using a spotlight or waiting for backup. As we note later, we find
 
 Anderson
 
 materially indistinguishable from this case, and controlling here.
 

 Even the dissent acknowledges that, under the circumstances presented here, it was appropriate for officers to make a "brief seizure" of Smith, approach his vehicle, and knock on the window to check on him.
 
 See
 

 infra
 
 ¶ 31. Thus, the dissent's complaint is not with the seizure or the welfare check itself, but with the perceived intrusiveness of the manner in which it was carried out.
 

 Smith also argues that, in evaluating the facts of the case and applying legal doctrines to them, this court is prohibited from considering any fact not expressly included in the district court's specific findings of fact. While Smith correctly points out that appellate courts do not find facts and should not engage in resolving factual disputes, Smith's overall contention is incorrect. Appellate courts are to examine the entire record and are required to consider even facts that the district court did not expressly mention or include in its factual findings, so long as, in so doing, the court does not resolve factual disputes or consider disputed facts undisputed.
 
 See
 

 Carbon County v. Workforce Appeals Board
 
 ,
 
 2013 UT 41
 
 , ¶¶ 11, 13,
 
 308 P.3d 477
 
 (stating that governing case law does not "require[ ] a litigant to request that a judge add undisputed facts to a ruling in order to preserve those facts for appeal," and that "[l]itigants are free to use the undisputed evidence in the record to make legal arguments" on appeal even if those facts are not incorporated into the district court's factual findings, and holding that the court of appeals erred by "refus[ing] to factor into its legal conclusions" a piece of "undisputed evidence" that was not included in the lower tribunal's findings);
 
 see also
 

 Flying Diamond Oil Corp. v. Newton Sheep Co.
 
 ,
 
 776 P.2d 618
 
 , 622 (Utah 1989) ("[R]emand is not necessary if the evidence in the record is undisputed and the appellate court can fairly and properly resolve the case on the record before it."). In this case, while some of the facts we include in our factual recitation and in our legal analysis were not expressly mentioned by the district court in its findings, none of the facts upon which we rely were or are disputed by any party, and we may therefore consider them in applying the law to the facts of the case.