POHLMAN, Judge (dissenting):
 

 ¶22 This is a close case. I find myself in substantial agreement with the majority but ultimately conclude that the law compels a different result.
 

 ¶23 To begin, I note the areas of general agreement. Everyone agrees that Smith was seized. Thus, the officers' conduct cannot be justified as a consensual encounter.
 
 See, e.g.
 
 ,
 
 Florida v. Bostick
 
 ,
 
 501 U.S. 429
 
 , 434,
 
 111 S.Ct. 2382
 
 ,
 
 115 L.Ed.2d 389
 
 (1991). Next, everyone agrees that this case is solely about community caretaking. There is no argument that the State had sufficient individualized suspicion of criminal wrongdoing to conduct a
 
 Terry
 
 stop,
 
 see
 

 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 , 21,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968) ;
 
 cf.
 

 State v. Malloy
 
 ,
 
 2019 UT App 55
 
 , ¶¶ 6 & n.2, 11-12, or a warrantless search of Smith's car under the automobile exception to the warrant requirement,
 
 see
 

 Wyoming v. Houghton
 
 ,
 
 526 U.S. 295
 
 , 300,
 
 119 S.Ct. 1297
 
 ,
 
 143 L.Ed.2d 408
 
 (1999).
 

 ¶24 Next, I agree with the majority that a welfare check of some kind was warranted. And I believe that the balancing test in
 
 State v. Anderson
 
 ,
 
 2015 UT 90
 
 ,
 
 362 P.3d 1232
 
 , is the relevant authority for analyzing the welfare check. I would simply weigh the interests differently and hold that the manner in which the officers performed the welfare check outstripped its justification. But before weighing the interests, I note a few important background principles.
 

 I
 

 ¶25 The Fourth Amendment almost always requires individualized suspicion of criminal wrongdoing.
 
 Chandler v. Miller
 
 ,
 
 520 U.S. 305
 
 , 313,
 
 117 S.Ct. 1295
 
 ,
 
 137 L.Ed.2d 513
 
 (1997). The community caretaking doctrine is an exception to that rule and, accordingly, has always been carefully circumscribed in its application.
 
 See
 

 id.
 

 at 309
 
 ,
 
 117 S.Ct. 1295
 
 (describing the "closely guarded category of constitutionally permissible suspicionless searches"). Start with
 
 Cady v. Dombrowski
 
 ,
 
 413 U.S. 433
 
 ,
 
 93 S.Ct. 2523
 
 ,
 
 37 L.Ed.2d 706
 
 (1973), in which the United States Supreme Court first recognized the community caretaking doctrine.
 
 [8]
 

 Id.
 

 at 441
 
 ,
 
 93 S.Ct. 2523
 
 . In
 
 Cady
 
 , the Court did not supplant traditional Fourth Amendment law; it instead acknowledged reality.
 
 See
 
 id.
 

 Officers frequently interact with the public, especially on the roads, and have, "for want of a better term, ... community caretaking functions" that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."
 

 Id.
 

 Recognizing this reality, the Court in
 
 Cady
 
 held that retrieving a revolver from the trunk of a towed car following an accident is reasonable community involvement that does not require a search warrant or some level of individualized suspicion.
 

 Id.
 

 at 442-43, 447-48
 
 ,
 
 93 S.Ct. 2523
 
 . Nothing more, nothing less.
 

 ¶26 The Supreme Court has said very little about the doctrine since.
 
 See
 

 Colorado v. Bertine
 
 ,
 
 479 U.S. 367
 
 , 372,
 
 107 S.Ct. 738
 
 ,
 
 93 L.Ed.2d 739
 
 (1987) ;
 
 South Dakota v. Opperman
 
 ,
 
 428 U.S. 364
 
 , 368-71, 374-75,
 
 96 S.Ct. 3092
 
 ,
 
 49 L.Ed.2d 1000
 
 (1976). That in itself, I think, supports the notion that community caretaking is not intended to be a broad, freewheeling exception to the Fourth Amendment. But the Supreme Court's treatment of related doctrines, notably the special needs exception to the warrant requirement, is also helpful in recognizing the community caretaking doctrine's limited application. Under the special needs exception, police may search or seize an individual without "individualized suspicion," but the special needs must serve interests " 'beyond the normal need for law enforcement.' "
 
 Chandler
 
 ,
 
 520 U.S. at 313
 
 ,
 
 117 S.Ct. 1295
 
 (quoting
 
 Skinner v. Railway Labor Execs.' Ass'n
 
 ,
 
 489 U.S. 602
 
 , 619,
 
 109 S.Ct. 1402
 
 ,
 
 103 L.Ed.2d 639
 
 (1989) ). Likewise, community caretaking requires police activity that is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."
 
 Cady
 
 ,
 
 413 U.S. at 441
 
 ,
 
 93 S.Ct. 2523
 
 . Thus, both the special needs exception and the community caretaking doctrine require police action distinct from day-to-day law enforcement. And as the Supreme Court has made clear in the special needs context, the police cannot use a suspicionless exception to the Fourth Amendment as pretext for ordinary criminal investigation.
 
 [9]
 

 See
 

 City of Indianapolis v. Edmond
 
 ,
 
 531 U.S. 32
 
 , 46-48,
 
 121 S.Ct. 447
 
 ,
 
 148 L.Ed.2d 333
 
 (2000).
 

 ¶27 Other courts that have grappled with factual scenarios similar to this one have also sought to guard the Fourth Amendment against gradual encroachment by the community caretaking doctrine.
 
 [10]
 

 See generally
 
 Michael R. Dimino Sr.,
 
 Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness
 
 ,
 
 66 Wash. & Lee L. Rev. 1485
 
 , 1494-1512 (2009). Some courts require an officer to "point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance."
 
 Commonwealth v. Livingstone
 
 ,
 
 644 Pa. 27
 
 ,
 
 174 A.3d 609
 
 , 634 (2017) ;
 
 accord
 

 Gentles v. State
 
 ,
 
 50 So. 3d 1192
 
 , 1199 (Fla. Dist. Ct. App. 2010). Under this test, generalized concerns about welfare will not justify a suspicionless search or seizure. So in
 
 Gentles
 
 , the seizure of a driver parked, with his engine running, in a shopping mall at 4:15 a.m. was not justified because the officer had "only a generalized, rather than a specific, concern about potential danger from the running motor."
 
 50 So. 3d at 1194-95, 1199
 
 .
 

 ¶28 Other courts require that the officers be engaged in "bona fide community caretaking activity."
 
 State v. Kurth
 
 ,
 
 813 N.W.2d 270
 
 , 278 (Iowa 2012). In
 
 Kurth
 
 , the Iowa Supreme Court held that an officer's "decision to activate his emergency lights and block in [the driver's] parked vehicle exceeded the scope of bona fide community caretaking activity."
 

 Id.
 

 The driver in that case had struck a road sign and then lawfully parked his car at a restaurant.
 

 Id.
 

 at 271-72
 
 . The officer observed that the damage to the car was minimal and that the car was still drivable.
 

 Id.
 

 at 278
 
 . Nevertheless, the officer "activated his emergency lights and blocked [the driver] in" his parking stall.
 

 Id.
 

 The court acknowledged that the officer "might have been justified in stopping" the driver immediately after the incident, but that the officer unreasonably waited to check on the driver.
 

 Id.
 

 And even if the officer wanted to check the vehicle for damage, "it was not necessary to block in the vehicle to do so. All he needed to do was to park next to him and approach him."
 

 Id.
 

 In addition, the court observed that the officer "called in the license plate" on the vehicle before making the stop.
 

 Id.
 

 at 279
 
 . Such an action, the court reasoned, was "inconsistent with a public safety purpose but [was] certainly consistent with an investigative purpose."
 

 Id.
 

 II
 

 ¶29 In light of these background principles, I now turn to the balancing test as articulated by our supreme court in
 
 State v. Anderson
 
 ,
 
 2015 UT 90
 
 ,
 
 362 P.3d 1232
 
 . Under that test, courts "first evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy"-including the "degree of overt authority and force displayed" and "the length of the seizure"-and then "determine whether the degree of the public interest and the exigency of the situation justified the seizure."
 
 Id.
 
 ¶ 26 (quotation simplified).
 

 ¶30 First, the degree of overt authority displayed here was not as "minimally invasive" as the majority suggests.
 
 Supra
 
 ¶ 14. Three officers and two squad cars responded to a routine "welfare check," and the three officers completely surrounded Smith, blocking any chance of escape. First Officer parked behind Smith and shined his "spotlight directly through" Smith's vehicle so that the officers would "have the advantage over" Smith. All three officers approached Smith's vehicle together, "two on the driver's side" and "one on the passenger's side." The presence of three officers coordinating their efforts also unreasonably prolonged Smith's seizure. First Officer parked behind Smith
 
 and then waited for backup
 
 . The reason for waiting: "it was suspected" that Smith was guilty of a DUI. Thus, when First Officer arrived on the scene, he was not so worried about Smith that he immediately checked on him. Instead, he waited for backup to investigate a possible DUI. As in
 
 State v. Kurth
 
 ,
 
 813 N.W.2d 270
 
 (Iowa 2012), such actions are "certainly consistent with an investigative purpose" but are "inconsistent with a public safety purpose."
 
 See
 

 id.
 

 at 279
 
 .
 

 ¶31 Second, the "perceived emergency" presented by Smith sleeping in his car was not, in my view, serious enough to justify the severity of the officers' intrusion upon Smith's freedom of movement and privacy.
 
 See
 

 Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 26,
 
 362 P.3d 1232
 
 . A brief seizure immediately upon arriving at the parking lot may have been justified, but "it was not necessary to block in [Smith's] vehicle to do so."
 
 See
 

 Kurth
 
 ,
 
 813 N.W.2d at 278
 
 . The welfare check could just as easily have been accomplished by a single officer pulling up alongside Smith, knocking on the door, and asking Smith if he was all
 right.
 
 [11]
 

 See
 

 United States v. Gross
 
 ,
 
 662 F.3d 393
 
 , 401 (6th Cir. 2011) (noting that in a factually similar situation, "any purported community-caretaking function ... could have been accomplished through a consensual encounter rather than an investigative stop").
 

 ¶32 The majority suggests that the officers here were not just concerned about Smith but were also "motivated by a concern for the safety of members of the community."
 
 Supra
 
 ¶ 15. That is not supported by the district court's findings,
 
 [12]
 
 but even if it were, the officers here had only a generalized concern about the public. One of the officers testified that they generally "don't know if ... the vehicle was stolen or ... what's going to happen, so [they] placed [their] vehicles behind [Smith's] vehicle in order to stop [Smith] from hitting the gas going backwards." But there were no objective, specific facts that Smith or his car were a danger to anyone. The call notes mentioned only a "male, slumped over the wheel, [who] appeared to be sleeping." And the McDonald's manager who asked Smith to leave only said that Smith was "not allowed" to sleep in his car. Based on the objective facts, there was not a specific, articulable fear on behalf of the community.
 

 ¶33 The majority also says that it "cannot meaningfully distinguish this case from
 
 Anderson
 
 " and that its result is therefore "compel[led]" by
 
 Anderson
 
 .
 
 Supra
 
 ¶ 19. I disagree. While the facts of
 
 Anderson
 
 and this case share similarities, I believe their differences are important.
 

 ¶34 In
 
 Anderson
 
 , a driver was apparently stranded on the side of a rural highway, late at night, in very cold weather (7 degrees below zero), and with his hazard lights flashing.
 
 2015 UT 90
 
 , ¶¶ 3, 28,
 
 362 P.3d 1232
 
 . Two officers noticed and decided to stop to check on the driver.
 
 Id.
 
 ¶ 3. The officers pulled over behind the driver's vehicle and turned on their red-and-blues.
 
 Id.
 
 Once the officers approached the driver, they noticed his eyes were bloodshot and then obtained a warrant authorizing the driver's arrest and a search of the vehicle.
 
 Id.
 
 ¶¶ 4-5. Importantly, the supreme court focused only on the time between "the initial seizure up until when the deputies approached his vehicle and asked whether he required assistance."
 
 Id.
 
 ¶ 27 n.1. As the encounter continued, the officers obtained greater suspicion, justifying greater police interference.
 
 Id.
 

 ¶35 Smith was parked not on a rural highway with his hazards on but in a parking lot of an establishment open for business. And though it was late at night, that fact alone cannot prompt legitimate concern for someone's well-being.
 
 See
 

 Gentles v. State
 
 ,
 
 50 So. 3d 1192
 
 , 1199 (Fla. Dist. Ct. App. 2010) ("[T]he fact that a motorist is asleep in his car with the motor running in an empty parking lot at night does not, without more, provide a reasonable basis for seizing the motorist."). As for the weather, there is no evidence of how cold the night in question was. But Smith had his engine running and was not far from an open McDonald's. The short of it is that being stranded on the side of a rural highway in freezing temperatures, as the majority acknowledges,
 
 supra
 
 ¶ 18, is poles apart from being parked in a McDonald's parking lot with a visibly functioning car.
 

 ¶36 Moreover, the officers' response here did not grow side-by-side with their suspicion. Rather, the officers went in aggressively from the start. First Officer explained that
 he suspected "a possible DUI" and purposefully parked his vehicle behind Smith to block Smith's escape and "waited for other officers to arrive before [he] made contact with the driver." The officers did not, however, have any proof of a possible DUI until they approached Smith's car, smelling alcohol on Smith's breath as he opened his door. In addition, from the start, First Officer shined his spotlight into Smith's car in order to hold "the advantage over" Smith. Had one of the officers initiated a less drastic seizure, or even attempted a consensual encounter, he likely would have still discovered Smith's drinking. The officer's interference with Smith's liberty, however, would have been commensurate to growing levels of suspicion.
 

 III
 

 ¶37 I do not suggest that a man asleep in his car in the middle of the night in a parking lot after being asked to leave raises no concern. But the issue here is whether the officers were checking on Smith's welfare or simply investigating crime. In
 
 State v. Anderson
 
 ,
 
 2015 UT 90
 
 ,
 
 362 P.3d 1232
 
 , the officers did not block the driver's exit, seek tactical advantages, or wait for backup before rendering aid to a stranded traveler on his way to Jericho. In contrast, the three officers here responded to a call from a McDonald's employee who, from all appearances, simply did not want Smith in the parking lot. And the objective facts show that the officers suspected a possible DUI for which they did not yet have individualized suspicion. The idea that the three officers were "concerned with Smith's well-being,"
 
 supra
 
 ¶ 18, totally apart from the investigation of crime, while perhaps not "tax[ing] the credulity of the credulous,"
 
 Maryland v. King
 
 ,
 
 569 U.S. 435
 
 , 466,
 
 133 S.Ct. 1958
 
 ,
 
 186 L.Ed.2d 1
 
 (2013) (Scalia, J., dissenting), is still a bit too fanciful for me to accept.
 

 ¶38 The United States Supreme Court has limited the community caretaking doctrine to police functions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."
 
 Cady v. Dombrowski
 
 ,
 
 413 U.S. 433
 
 , 441,
 
 93 S.Ct. 2523
 
 ,
 
 37 L.Ed.2d 706
 
 (1973). The Utah Supreme Court's decision in
 
 Anderson
 
 does not change this. Its balancing test instructs us to ask whether the manner of an individual's seizure is justified by a perceived noncriminal danger-i.e., was the seizure reasonable under all the circumstances?
 
 Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 26,
 
 362 P.3d 1232
 
 . And, on balance, I think that the manner of Smith's seizure was unreasonable. I therefore respectfully dissent.
 

 Since
 
 Cady
 
 , courts and commentators have recognized three distinct types of community caretaking: (1) the emergency aid doctrine; (2) the automobile inventory doctrine; and (3) the public servant doctrine.
 
 See
 
 Mary Elisabeth Naumann,
 
 The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception
 
 ,
 
 26 Am. J. Crim. L. 325
 
 , 330 (1999) [hereinafter "Naumann"];
 
 see also
 

 State v. Coffman
 
 ,
 
 914 N.W.2d 240
 
 , 244 (Iowa 2018) (listing the three separate doctrines);
 
 Commonwealth v. Livingstone
 
 ,
 
 644 Pa. 27
 
 ,
 
 174 A.3d 609
 
 , 626-27 (2017). I use the term "community caretaking" in its broadest sense.
 

 Admittedly, police officers are required to wear many hats and may have both community-caretaking and criminal-investigation purposes in mind when they stop to offer assistance.
 
 See
 

 Livingstone
 
 ,
 
 174 A.3d at 628-29
 
 . But
 
 Cady
 
 itself requires that community caretaking be "
 
 totally divorced
 
 from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."
 
 Cady v. Dombrowski
 
 ,
 
 413 U.S. 433
 
 , 441,
 
 93 S.Ct. 2523
 
 ,
 
 37 L.Ed.2d 706
 
 (1973) (emphasis added). This raises some questions about whether courts should view an officer's purposes objectively or subjectively. Notably, some commentators have suggested that courts should inquire into the officer's subjective intent. Michael R. Dimino Sr.,
 
 Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness
 
 ,
 
 66 Wash. & Lee L. Rev. 1485
 
 , 1528-31 (2009) [hereinafter "Dimino"];
 
 see also
 

 Livingstone
 
 ,
 
 174 A.3d at 645-46
 
 (Donohue, J., concurring and dissenting). I do not intend to resolve the question here but note that inquiry into an officer's subjective intent has been rejected in similar contexts,
 
 see
 

 Brigham City v. Stuart
 
 ,
 
 547 U.S. 398
 
 , 404,
 
 126 S.Ct. 1943
 
 ,
 
 164 L.Ed.2d 650
 
 (2006), but that such inquiry is not definitively foreclosed in this context,
 
 see
 

 Livingstone
 
 ,
 
 174 A.3d at
 
 646 ; Dimino, at 1518, 1528; Naumann, at 359-61. Even viewed objectively, I think the officers' actions in this case were unjustified.
 

 Most of the development of the community caretaking doctrine has happened in state courts.
 
 State v. Kurth
 
 ,
 
 813 N.W.2d 270
 
 , 273-74 (Iowa 2012). This is perhaps unsurprising "in light of the fact that community caretaking is generally the role of local police rather than federal officers."
 

 Id.
 

 ;
 
 see also
 

 Cady
 
 ,
 
 413 U.S. at 441
 
 ,
 
 93 S.Ct. 2523
 
 (recognizing that "[l]ocal police officers," rather than federal officers, are likely to engage in "community caretaking functions");
 
 Coffman
 
 ,
 
 914 N.W.2d at 260-64
 
 (Appel, J., dissenting) (collecting both state and federal cases discussing the doctrine).
 

 Of course, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render" Smith's seizure unreasonable.
 
 See
 

 Cady
 
 ,
 
 413 U.S. at 447
 
 ,
 
 93 S.Ct. 2523
 
 . And there is a difference between consensual encounters, in which there is no seizure, and community caretaking, in which there is.
 
 See
 

 Livingstone
 
 ,
 
 174 A.3d at 620
 
 . But the question under
 
 Anderson
 
 's second step is still whether the State's community-caretaking interests "justifies
 
 the degree
 
 to which an officer interferes with [an individual's] freedoms."
 
 State v. Anderson
 
 ,
 
 2015 UT 90
 
 , ¶ 26,
 
 362 P.3d 1232
 
 (emphasis added). In my view, the officers could have accomplished any community-caretaking purposes with much less intrusive means, and Smith's seizure was therefore unreasonable.
 

 The district court found that the "perceived emergency in this case was that there was a welfare check, or some concern about
 
 Smith's
 
 well-being." (Emphasis added.) There was no expressed concern about the public at large being in danger.