**2019 UT App 75**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRETT THOMAS SMITH,
Appellant.

Opinion
No. 20180101-CA
Filed May 2, 2019

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 171902685

Stephen R. Frazier and Douglas J. Thompson,
Attorneys for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER concurred.
JUDGE JILL M. POHLMAN dissented, with opinion.

HARRIS, Judge:

¶1    Brett Thomas Smith fell asleep in his car in a McDonald's parking lot in the wee hours of the morning, and refused to leave the premises even after he was asked to do so. Police soon arrived, and in the process of waking him up detected alcohol on his breath. Smith was later charged with driving under the influence (DUI), and moved to suppress all evidence discovered that night on the ground that he was unreasonably seized in violation of the United States Constitution. The district court denied that motion, determining that the seizure was justified by the community caretaking doctrine. Smith appeals that decision, and we affirm.

BACKGROUND

¶2 In the wee hours of a cold December morning in 2016, several employees of a McDonald's restaurant in West Valley City, Utah noticed that a man—who was later identified as Smith—appeared to be asleep in his car, which was parked in the restaurant's parking lot with the motor running. The restaurant's shift manager (Manager) went out to the parking lot and attempted to wake Smith and tell him that he needed to leave, but Smith did not respond to verbal entreaties. Manager then knocked on the car's window and was finally able to rouse Smith and asked him to leave the premises. Smith then pulled out of the parking spot, drove around the building, and re-parked in the same parking lot. Manager then informed his co-manager that Smith had not left the premises as requested, and one of them notified the police.[1]

¶3 Police officers responded to the scene after receiving a dispatch call that a welfare check was needed at McDonald's. Specifically, the dispatch call notes mentioned that there was a "male, slumped over the wheel, [who] appeared to be sleeping," and the first officer (First Officer) to arrive on the scene later testified that the dispatch call he received informed him that "an individual . . . was driving their car around the parking lot multiple times, and then had fallen asleep at the wheel in a

---

1. The State has not argued, either before the district court or on appeal, that the officers had probable cause (or reasonable suspicion) to detain Smith on account of his refusal to leave the McDonald's parking lot after being asked to do so. Accordingly, we have no occasion to consider that issue. *Cf. State v. Malloy*, 2019 UT App 55, ¶ 6 n.2 (declining to consider whether the community caretaking doctrine applied to the facts of the case, because reasonable suspicion was present for other reasons).

parking stall."[2] When First Officer arrived, he immediately located the vehicle in question, and noticed that "the vehicle was on and running." Based on all of the information he had, First Officer made the decision to park behind Smith's vehicle in such a way that would have made it difficult for Smith to exit the parking stall, and waited for other officers before making contact. As he waited, First Officer observed that Smith was "hunched over the center console," and that he was "not awake." In addition, First Officer shined a spotlight on Smith's car to ascertain whether Smith was its only occupant. When the next officer (Second Officer) arrived on scene, he observed a parked car with its motor running in which a male occupant was slumped over the wheel, apparently asleep. Second Officer parked his patrol car alongside Smith's vehicle. Either First Officer or Second Officer was accompanied by a third officer; in total, three police officers were on scene.

¶4     All three officers exited their vehicles, and approached Smith's vehicle. As they did so, they were wearing their typical police gear, but they never activated the emergency lights on their police vehicles, and there is no indication in the record that any of the officers ever unholstered any weapon. The officers knocked on Smith's car window multiple times in an attempt to wake him. When Smith eventually awoke, the officers asked him to open his door, and he complied.

¶5     Once the door was opened, the officers "smell[ed] the odor of alcohol on [Smith's] breath." Second Officer asked Smith to step out and perform field sobriety tests, and Smith complied.

---

2. Indeed, the district court found that "[i]t was reported that [Smith] was sleeping in his car, in the middle of the night, in the middle of winter, with the car running, in the parking lot of a restaurant that was open 24 hours." Smith does not challenge that factual finding.

The results of the tests indicated that Smith was likely intoxicated. Second Officer also learned, upon checking Smith's driver license in a database, that Smith's license had been revoked. The officers arrested Smith and read him his *Miranda*[3] rights, after which Smith admitted that he had consumed enough alcohol to make him believe that he was over the legal limit. The officers took Smith to the West Valley City police station where they administered a breathalyzer test, which indicated that Smith's blood-alcohol content was .135, well over the legal limit. Smith was later charged with driving under the influence of alcohol with prior convictions, a third-degree felony; operating a vehicle as an alcohol restricted driver, a class B misdemeanor; and driving on a suspended or revoked license, a class B misdemeanor.

¶6     Smith filed a motion to suppress his statements as well as the results of the field sobriety and breathalyzer tests, alleging that the evidence was obtained by virtue of an illegal seizure. Smith asserted that the facts did not justify the seizure, arguing that the officers did not have probable cause or reasonable suspicion to believe a crime had been committed. After an evidentiary hearing, the district court denied Smith's motion, ruling that, although the officers had indeed seized Smith, the seizure was justified under the community caretaking doctrine.

¶7     Following the court's denial of his motion to suppress, Smith entered a conditional guilty plea[4] to the felony DUI

---

3. *See Miranda v. Arizona*, 384 U.S. 436, 468–69 (1966).

4. With the consent of the prosecution and the approval of the judge, a defendant may enter a conditional guilty plea, while "preserv[ing] [a] suppression issue for appeal." *State v. Sery*, 758 P.2d 935, 938–40 (Utah Ct. App. 1988), *disagreed with on other grounds by State v. Pena*, 869 P.2d 932 (Utah 1994). "A defendant
(continued…)

charge, and the State agreed to dismiss the remaining counts. As part of his conditional plea, Smith retained his right to appeal the denial of his motion to suppress, which right Smith now exercises by challenging that decision on appeal.

ISSUE AND STANDARD OF REVIEW

¶8      "We review a [district] court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. Under this standard, "[w]hile the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *Id.*

ANALYSIS

¶9      The Fourth Amendment to the United States Constitution "does not prohibit all police seizures." *State v. Anderson*, 2015 UT 90, ¶ 25, 362 P.3d 1232. Instead, it prohibits only "unreasonable" seizures. *See* U.S. Const. amend. IV (stating that citizens have a right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"). In this case, the parties do not contest the fact that the officers seized Smith in the McDonald's parking lot. The question presented in this case, then, is whether that seizure was reasonable. Smith argues that his seizure was unreasonable and therefore unconstitutional, and that the evidence discovered pursuant to that seizure must be excluded. *See Mapp v. Ohio*, 367 U.S. 643, 660 (1961) (determining that evidence obtained in violation of the Fourth

_____

(…continued)
who prevails on appeal [after entering a conditional plea] shall be allowed to withdraw the plea." Utah R. Crim. P. 11(j).

Amendment would be excluded from a defendant's criminal trial). The State, by contrast, asserts that the officers' seizure of Smith was reasonable, and justified by the community caretaking doctrine. We agree with the State.

¶10 "The reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Anderson*, 2015 UT 90, ¶ 25 (quotation simplified). "Greater intrusions upon an individual's freedom of movement require a concomitant greater showing of a legitimate government interest to justify the intrusion, while a lesser intrusion may be justified by a lesser showing of a government interest." *Id.* For these reasons, "a highly intrusive arrest requires probable cause, while a less intrusive *Terry* stop requires a less stringent reasonable suspicion standard." *Id.* (referring to *Terry v. Ohio*, 392 U.S. 1, 21, 24–27 (1968)).

¶11 In one attempt to strike the appropriate balance, the United States Supreme Court has articulated the community caretaking doctrine. *See Cady v. Dombrowski*, 413 U.S. 433, 447–48 (1973); *see also Anderson*, 2015 UT 90, ¶ 26 (stating that "[t]his balancing between an individual's interest in being free from police intrusions and the State's legitimate interest in the public welfare . . . animates the community caretaking doctrine"). In *Cady*, the Court held that police officers' warrantless search of the trunk of a parked car did not violate the Fourth Amendment because the officers reasonably believed that the trunk contained a loaded gun that could endanger the public if it fell into the wrong hands. 413 U.S. at 447–48. The Court stated that officers "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441.

¶12   Our supreme court—like many other state courts—has applied the community caretaking doctrine to "justify the seizure of a vehicle to ensure the safety of the occupants." *Anderson*, 2015 UT 90, ¶¶ 17, 30 (citing other state courts that recognize the doctrine, and holding "that the community caretaking doctrine justified the seizure" of a vehicle to determine "whether any occupants of the vehicle required aid"). In *Anderson*, the court articulated a two-part test to be applied in determining whether the community caretaking doctrine reasonably justifies a seizure. First, "courts must . . . evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy." *Id.* ¶ 26. In evaluating this first factor, "courts should look to both the degree of overt authority and force displayed in effecting the seizure, and the length of the seizure." *Id.* (quotation simplified). Second, "courts must determine whether the degree of the public interest and the exigency of the situation justified the seizure for community caretaking purposes." *Id.* (quotation simplified). In evaluating this second factor, courts should evaluate the seriousness of the "perceived emergency," along with "the likelihood that the motorist may need aid." *Id.* After evaluating these factors, "[i]f the level of the State's interest in investigating whether a motorist needs aid justifies the degree to which an officer interferes with the motorist's freedoms in order to perform this investigation, the seizure is not 'unreasonable' under the Fourth Amendment." *Id.*

¶13   In *Anderson*, two law enforcement officers on patrol on a cold late-December evening noticed a car pulled over on the side of a rural highway with its hazard lights flashing. *Id.* ¶ 3. "Because of the hazard lights, the cold weather, and the late hour, the deputies decided to stop and check on the welfare of any occupants of the vehicle." *Id.* To this end, they turned their flashing lights on and pulled up behind the parked car, then exited their vehicle and approached the parked car on foot. *Id.* ¶¶ 3–4. When the officers made contact with the occupant of the

vehicle, they noticed that his eyes appeared bloodshot and that he was unable to tell them which direction he was going. *Id.* ¶ 4. Eventually, the officers obtained a warrant authorizing them to arrest the occupant and search his vehicle, and upon executing that search the officers found marijuana and drug paraphernalia. *Id.* ¶ 5. After being charged with drug crimes, the occupant moved to suppress the evidence discovered in his vehicle, alleging the initial actions of the officers constituted an unreasonable seizure, but the district court denied the motion, ruling that the stop was justified by the community caretaking doctrine. *Id.* ¶ 6. Our supreme court affirmed, concluding that both parts of the test weighed in favor of application of the doctrine. *Id.* ¶ 30. First, the court determined that the seizure was only minimally invasive, because the occupant "was parked, rather than traveling down the highway, when he was seized," thereby "lessening" the officers' interference with his freedom of movement, and because the officers' "show of authority . . . was minimal." *Id.* ¶ 27. Second, the court determined that, "[b]ecause it was late December" and "dark and very cold," "a reasonable officer would have cause to be concerned about the welfare of a motorist in [the occupant's] situation." *Id.* ¶ 28.

¶14 When we apply *Anderson*'s two-part test to the facts of this case, we conclude that the seizure of Smith in the McDonald's parking lot was justified by the community caretaking doctrine. First, the officers in this case were motivated by the same purposes as the officers in *Anderson*—checking on the welfare of an occupant of a parked car on a cold night—and the officers carried out the welfare check in a similar and minimally invasive manner. Although the officers positioned their vehicle in such a way that Smith could not easily drive away, Smith was already parked and asleep in the driver's seat, and was not intending to go anywhere anytime soon. *See id.* ¶ 27 (stating that the occupant "was parked . . . when he was seized, lessening . . . the deputies' interference with his right to go about his business"). In addition, the officers here—unlike those in

*Anderson*—did not activate their emergency lights, and—similar to those in *Anderson*—did not draw their weapons. Finally, the initial seizure was brief, lasting only long enough for the officers to make sure that Smith did not pose a threat to himself or others.[5] *Compare id.* (finding a seizure minimally invasive, given the purpose of the welfare check, because the occupant was

---

5. The dissent finds *Anderson* distinguishable, largely on the basis that (a) in this case, "[t]hree officers and two squad cars" approached Smith, whereas in *Anderson* only two officers in one squad car were on scene; (b) in this case, the officers "completely surrounded Smith, blocking any chance of escape," whereas in *Anderson* the officers detained the individual by pulling up behind his car and turning on their flashing lights; (c) in this case, the officers shined a spotlight on Smith's car, while the *Anderson* opinion does not describe spotlights or flashlights; and (d) in this case, the first officer to arrive on scene *"waited for backup." Compare infra* ¶ 30, *with State v. Anderson*, 2015 UT 90, ¶ 3, 362 P.3d 1232. We acknowledge these differences between our case and *Anderson*, but we do not find them material. In both cases, the officers were motivated by the same purpose: checking on the welfare of the occupant of a parked car on a cold winter night. We cannot see any sense in a legal rule proclaiming that the use of three officers to conduct that kind of welfare check is too many, but the use of two officers is just fine. We see no meaningful distinction between an officer parking behind a parked car to cut off its escape, on the one hand, and an officer pulling up behind a parked car with lights flashing, on the other; in both cases, the officer has used his vehicle to command the individual to remain in place, and in neither case is the detained individual free to go. And we are not willing to fault officers, who are responding to a potentially dynamic situation, for taking precautions such as using a spotlight or waiting for backup. As we note later, we find *Anderson* materially indistinguishable from this case, and controlling here.

parked, the officers' weapons were not drawn, and the seizure was only long enough for the officer to approach and ask whether the occupant needed aid), *with United States v. King*, 990 F.2d 1552, 1562–63 (10th Cir. 1993) (finding a seizure overly invasive and unreasonable where the actions taken by the officers—approaching the occupant of the vehicle with guns drawn and ordering the individual to put his hands on the steering wheel or be shot—were disproportionate and unnecessary to accomplish the purpose of the welfare check).

¶15 Second, the nature of the "public interest and the exigency of the situation" is similar to *Anderson*.[6] 2015 UT 90, ¶ 26 (quotation simplified). In both cases, officers were motivated by a concern for the safety of an occupant of a parked vehicle in the late hours of a cold December night, and in this case the officers were also motivated by a concern for the safety of members of the community. Indeed, *Cady* instructs us that the community caretaking doctrine may be motivated not just by a concern for the individual involved, but also for members of the community who might be in danger. *See* 413 U.S. at 447–48 (applying the community caretaking doctrine where police officers conducted a warrantless search of the trunk of a parked car because they reasonably believed that the trunk contained a loaded gun that could endanger the public if it fell into the wrong hands). Here, the officers testified that they were concerned that the driver might have been "unconscious or not breathing," or that, because the car was running, the driver might "hit[] the gas" and

---

6. Even the dissent acknowledges that, under the circumstances presented here, it was appropriate for officers to make a "brief seizure" of Smith, approach his vehicle, and knock on the window to check on him. *See infra* ¶ 31. Thus, the dissent's complaint is not with the seizure or the welfare check itself, but with the perceived intrusiveness of the manner in which it was carried out.

go "backwards," thereby endangering others. Moreover, in this case, the officers were not acting of their own accord; they were responding to a 911 call from a concerned citizen. Officers in situations like this are entitled to rely on information received from citizens that is passed to them through a dispatch call. *See State v. Roybal*, 2010 UT 34, ¶¶ 14–16, 232 P.3d 1016.

¶16    Smith argues that some of the additional facts that the officers learned—including the fact that Smith was asleep at the wheel of a running car, and had earlier been seen driving around the parking lot before re-parking—became known to them only after they had already seized Smith, and therefore cannot be used to justify the seizure. This contention, however, is not supported by the record. One of the officers specifically testified that "dispatch had received a call from McDonald's employees that an individual . . . was driving their car around the parking lot multiple times, and then had fallen asleep at the wheel in a parking stall." And First Officer testified that he observed that the car was running before parking behind Smith.[7]

---

7. Smith also argues that, in evaluating the facts of the case and applying legal doctrines to them, this court is prohibited from considering any fact not expressly included in the district court's specific findings of fact. While Smith correctly points out that appellate courts do not find facts and should not engage in resolving factual disputes, Smith's overall contention is incorrect. Appellate courts are to examine the entire record and are required to consider even facts that the district court did not expressly mention or include in its factual findings, so long as, in so doing, the court does not resolve factual disputes or consider disputed facts undisputed. *See Carbon County v. Workforce Appeals Board*, 2013 UT 41, ¶¶ 11, 13, 308 P.3d 477 (stating that governing case law does not "require[] a litigant to request that a judge add undisputed facts to a ruling in order to preserve those

(continued…)

¶17   Next, Smith asserts that the officers in this case acted with too much force, arguing that three officers and two squad cars was too strong a showing of police authority under the circumstances. While law enforcement may well have been able to handle this situation with one officer who parked alongside (rather than behind) Smith, we are not persuaded that the officers' show of force was so excessive here as to render the community caretaking doctrine inapplicable. The officers did not initiate their flashing lights, and did not draw their weapons; instead, they approached Smith's vehicle, knocked on the window, and asked to speak with him.

¶18   Finally, Smith asserts that the nature of the emergency in this case was not as acute as that presented in *Anderson*. Perhaps this is true. Perhaps a vehicle on the side of a rural highway with its flashers on signals a higher-level emergency—at least for the occupant of the vehicle—than does a vehicle parked in a

---

(…continued)

facts for appeal," and that "[l]itigants are free to use the undisputed evidence in the record to make legal arguments" on appeal even if those facts are not incorporated into the district court's factual findings, and holding that the court of appeals erred by "refus[ing] to factor into its legal conclusions" a piece of "undisputed evidence" that was not included in the lower tribunal's findings); *see also Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 622 (Utah 1989) ("[R]emand is not necessary if the evidence in the record is undisputed and the appellate court can fairly and properly resolve the case on the record before it."). In this case, while some of the facts we include in our factual recitation and in our legal analysis were not expressly mentioned by the district court in its findings, none of the facts upon which we rely were or are disputed by any party, and we may therefore consider them in applying the law to the facts of the case.

restaurant parking lot in the middle of the night. But we cannot say that this situation presented no emergency; indeed, the officers were justifiably concerned with Smith's well-being, as well as the safety of other restaurant patrons who may encounter Smith's vehicle.

¶19    In the end, we cannot meaningfully distinguish this case from *Anderson*, and we believe that *Anderson* compels the result in this case. Just as in *Anderson*, we "determine that the community caretaking doctrine justified the seizure," because the officers' "brief seizure" of Smith brought about only "minimal interference with [Smith's] freedom of movement," and because the State had a compelling "interest in determining whether any occupants of the vehicle required aid under these circumstances." *See* 2015 UT 90, ¶ 30; *see also In re Clayton*, 748 P.2d 401, 402 (Idaho 1988) (determining that a seizure was justified by the community caretaking doctrine where a police officer observed "a vehicle in a parking lot adjacent to a bar" at "1:30 in the morning," the vehicle's "engine was running," and an individual "was sitting in the driver's seat behind the steering wheel, with his head slumped forward").

CONCLUSION

¶20    The officers' brief seizure of Smith was not unreasonable, because both parts of the community caretaking doctrine test are satisfied here. In this case, the level of the State's interest in investigating whether Smith needed aid justified the rather minimal degree to which the officers briefly and unobtrusively interfered with Smith's freedom of movement. *See Anderson*, 2015 UT 90, ¶ 26. Accordingly, the evidence discovered subsequent to Smith's brief seizure "was not the fruit of a violation of his Fourth Amendment rights." *Id.* ¶ 30.

¶21    Affirmed.

_____

POHLMAN, Judge (dissenting):

¶22    This is a close case. I find myself in substantial agreement with the majority but ultimately conclude that the law compels a different result.

¶23    To begin, I note the areas of general agreement. Everyone agrees that Smith was seized. Thus, the officers' conduct cannot be justified as a consensual encounter. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Next, everyone agrees that this case is solely about community caretaking. There is no argument that the State had sufficient individualized suspicion of criminal wrongdoing to conduct a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 21 (1968); *cf. State v. Malloy*, 2019 UT App 55, ¶¶ 6 & n.2, 11–12, or a warrantless search of Smith's car under the automobile exception to the warrant requirement, *see Wyoming v. Houghton*, 526 U.S. 295, 300 (1999).

¶24    Next, I agree with the majority that a welfare check of some kind was warranted. And I believe that the balancing test in *State v. Anderson*, 2015 UT 90, 362 P.3d 1232, is the relevant authority for analyzing the welfare check. I would simply weigh the interests differently and hold that the manner in which the officers performed the welfare check outstripped its justification. But before weighing the interests, I note a few important background principles.

I

¶25 The Fourth Amendment almost always requires individualized suspicion of criminal wrongdoing. *Chandler v. Miller*, 520 U.S. 305, 313 (1997). The community caretaking doctrine is an exception to that rule and, accordingly, has always been carefully circumscribed in its application. *See id.* at 309 (describing the "closely guarded category of constitutionally permissible suspicionless searches"). Start with *Cady v.*

*Dombrowski*, 413 U.S. 433 (1973), in which the United States Supreme Court first recognized the community caretaking doctrine.[8] *Id.* at 441. In *Cady*, the Court did not supplant traditional Fourth Amendment law; it instead acknowledged reality. *See id.* Officers frequently interact with the public, especially on the roads, and have, "for want of a better term, . . . community caretaking functions" that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* Recognizing this reality, the Court in *Cady* held that retrieving a revolver from the trunk of a towed car following an accident is reasonable community involvement that does not require a search warrant or some level of individualized suspicion. *Id.* at 442–43, 447–48. Nothing more, nothing less.

¶26    The Supreme Court has said very little about the doctrine since. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 368–71, 374–75 (1976). That in itself, I think, supports the notion that community caretaking is not intended to be a broad, freewheeling exception to the Fourth Amendment. But the Supreme Court's treatment of related doctrines, notably the special needs exception to the warrant requirement, is also helpful in recognizing the community caretaking doctrine's limited application. Under the special

---

8. Since *Cady*, courts and commentators have recognized three distinct types of community caretaking: (1) the emergency aid doctrine; (2) the automobile inventory doctrine; and (3) the public servant doctrine. *See* Mary Elisabeth Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 330 (1999) [hereinafter "Naumann"]; *see also State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018) (listing the three separate doctrines); *Commonwealth v. Livingstone*, 174 A.3d 609, 626–27 (Pa. 2017). I use the term "community caretaking" in its broadest sense.

needs exception, police may search or seize an individual without "individualized suspicion," but the special needs must serve interests "'beyond the normal need for law enforcement.'" *Chandler*, 520 U.S. at 313 (quoting *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989)). Likewise, community caretaking requires police activity that is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441. Thus, both the special needs exception and the community caretaking doctrine require police action distinct from day-to-day law enforcement. And as the Supreme Court has made clear in the special needs context, the police cannot use a suspicionless exception to the Fourth Amendment as pretext for ordinary criminal investigation.[9] *See City of Indianapolis v. Edmond*, 531 U.S. 32, 46–48 (2000).

---

9. Admittedly, police officers are required to wear many hats and may have both community-caretaking and criminal-investigation purposes in mind when they stop to offer assistance. *See Livingstone*, 174 A.3d at 628–29. But *Cady* itself requires that community caretaking be "*totally divorced* from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (emphasis added). This raises some questions about whether courts should view an officer's purposes objectively or subjectively. Notably, some commentators have suggested that courts should inquire into the officer's subjective intent. Michael R. Dimino Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1528–31 (2009) [hereinafter "Dimino"]; *see also Livingstone*, 174 A.3d at 645–46 (Donohue, J., concurring and dissenting). I do not intend to resolve the question here but note that inquiry into an officer's subjective intent has been rejected in similar contexts, *see Brigham City v. Stuart*, 547 U.S.

(continued…)

¶27 Other courts that have grappled with factual scenarios similar to this one have also sought to guard the Fourth Amendment against gradual encroachment by the community caretaking doctrine.[10] *See generally* Michael R. Dimino Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1494–1512 (2009). Some courts require an officer to "point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance." *Commonwealth v. Livingstone*, 174 A.3d 609, 634 (Pa. 2017); *accord Gentles v. State*, 50 So. 3d 1192, 1199 (Fla. Dist. Ct. App. 2010). Under this test, generalized concerns about welfare will not justify a suspicionless search or seizure. So in *Gentles*, the seizure of a driver parked, with his engine running, in a shopping mall at 4:15 a.m. was not justified because the officer had "only a generalized, rather than a specific, concern about potential danger from the running motor." 50 So. 3d at 1194–95, 1199.

---

(…continued)

398, 404 (2006), but that such inquiry is not definitively foreclosed in this context, *see Livingstone*, 174 A.3d at 646; Dimino, at 1518, 1528; Naumann, at 359–61. Even viewed objectively, I think the officers' actions in this case were unjustified.

10. Most of the development of the community caretaking doctrine has happened in state courts. *State v. Kurth*, 813 N.W.2d 270, 273–74 (Iowa 2012). This is perhaps unsurprising "in light of the fact that community caretaking is generally the role of local police rather than federal officers." *Id.*; *see also Cady*, 413 U.S. at 441 (recognizing that "[l]ocal police officers," rather than federal officers, are likely to engage in "community caretaking functions"); *Coffman*, 914 N.W.2d at 260–64 (Appel, J., dissenting) (collecting both state and federal cases discussing the doctrine).

¶28    Other courts require that the officers be engaged in "bona fide community caretaking activity." *State v. Kurth*, 813 N.W.2d 270, 278 (Iowa 2012). In *Kurth*, the Iowa Supreme Court held that an officer's "decision to activate his emergency lights and block in [the driver's] parked vehicle exceeded the scope of bona fide community caretaking activity." *Id.* The driver in that case had struck a road sign and then lawfully parked his car at a restaurant. *Id.* at 271–72. The officer observed that the damage to the car was minimal and that the car was still drivable. *Id.* at 278. Nevertheless, the officer "activated his emergency lights and blocked [the driver] in" his parking stall. *Id.* The court acknowledged that the officer "might have been justified in stopping" the driver immediately after the incident, but that the officer unreasonably waited to check on the driver. *Id.* And even if the officer wanted to check the vehicle for damage, "it was not necessary to block in the vehicle to do so. All he needed to do was to park next to him and approach him." *Id.* In addition, the court observed that the officer "called in the license plate" on the vehicle before making the stop. *Id.* at 279. Such an action, the court reasoned, was "inconsistent with a public safety purpose but [was] certainly consistent with an investigative purpose." *Id.*

II

¶29    In light of these background principles, I now turn to the balancing test as articulated by our supreme court in *State v. Anderson*, 2015 UT 90, 362 P.3d 1232. Under that test, courts "first evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy"—including the "degree of overt authority and force displayed" and "the length of the seizure"—and then "determine whether the degree of the public interest and the exigency of the situation justified the seizure." *Id.* ¶ 26 (quotation simplified).

¶30    First, the degree of overt authority displayed here was not as "minimally invasive" as the majority suggests. *Supra* ¶ 14.

Three officers and two squad cars responded to a routine "welfare check," and the three officers completely surrounded Smith, blocking any chance of escape. First Officer parked behind Smith and shined his "spotlight directly through" Smith's vehicle so that the officers would "have the advantage over" Smith. All three officers approached Smith's vehicle together, "two on the driver's side" and "one on the passenger's side." The presence of three officers coordinating their efforts also unreasonably prolonged Smith's seizure. First Officer parked behind Smith *and then waited for backup*. The reason for waiting: "it was suspected" that Smith was guilty of a DUI. Thus, when First Officer arrived on the scene, he was not so worried about Smith that he immediately checked on him. Instead, he waited for backup to investigate a possible DUI. As in *State v. Kurth*, 813 N.W.2d 270 (Iowa 2012), such actions are "certainly consistent with an investigative purpose" but are "inconsistent with a public safety purpose." *See id.* at 279.

¶31    Second, the "perceived emergency" presented by Smith sleeping in his car was not, in my view, serious enough to justify the severity of the officers' intrusion upon Smith's freedom of movement and privacy. *See Anderson*, 2015 UT 90, ¶ 26. A brief seizure immediately upon arriving at the parking lot may have been justified, but "it was not necessary to block in [Smith's] vehicle to do so." *See Kurth*, 813 N.W.2d at 278. The welfare check could just as easily have been accomplished by a single officer pulling up alongside Smith, knocking on the door, and asking Smith if he was all right.[11] *See United States v. Gross*, 662

---

11. Of course, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render" Smith's seizure unreasonable. *See Cady*, 413 U.S. at 447. And there is a difference between consensual encounters, in which there is no seizure, and community caretaking, in which there is. *See Livingstone*, 174

(continued…)

F.3d 393, 401 (6th Cir. 2011) (noting that in a factually similar situation, "any purported community-caretaking function . . . could have been accomplished through a consensual encounter rather than an investigative stop").

¶32 The majority suggests that the officers here were not just concerned about Smith but were also "motivated by a concern for the safety of members of the community." *Supra* ¶ 15. That is not supported by the district court's findings,[12] but even if it were, the officers here had only a generalized concern about the public. One of the officers testified that they generally "don't know if . . . the vehicle was stolen or . . . what's going to happen, so [they] placed [their] vehicles behind [Smith's] vehicle in order to stop [Smith] from hitting the gas going backwards." But there were no objective, specific facts that Smith or his car were a danger to anyone. The call notes mentioned only a "male, slumped over the wheel, [who] appeared to be sleeping." And the McDonald's manager who asked Smith to leave only said that Smith was "not allowed" to sleep in his car. Based on the

---

(…continued)

A.3d at 620. But the question under *Anderson*'s second step is still whether the State's community-caretaking interests "justifies *the degree* to which an officer interferes with [an individual's] freedoms." *State v. Anderson*, 2015 UT 90, ¶ 26, 362 P.3d 1232 (emphasis added). In my view, the officers could have accomplished any community-caretaking purposes with much less intrusive means, and Smith's seizure was therefore unreasonable.

12. The district court found that the "perceived emergency in this case was that there was a welfare check, or some concern about *Smith's* well-being." (Emphasis added.) There was no expressed concern about the public at large being in danger.

objective facts, there was not a specific, articulable fear on behalf of the community.

¶33 The majority also says that it "cannot meaningfully distinguish this case from *Anderson*" and that its result is therefore "compel[led]" by *Anderson*. *Supra* ¶ 19. I disagree. While the facts of *Anderson* and this case share similarities, I believe their differences are important.

¶34 In *Anderson*, a driver was apparently stranded on the side of a rural highway, late at night, in very cold weather (7 degrees below zero), and with his hazard lights flashing. 2015 UT 90, ¶¶ 3, 28. Two officers noticed and decided to stop to check on the driver. *Id.* ¶ 3. The officers pulled over behind the driver's vehicle and turned on their red-and-blues. *Id.* Once the officers approached the driver, they noticed his eyes were bloodshot and then obtained a warrant authorizing the driver's arrest and a search of the vehicle. *Id.* ¶¶ 4–5. Importantly, the supreme court focused only on the time between "the initial seizure up until when the deputies approached his vehicle and asked whether he required assistance." *Id.* ¶ 27 n.1. As the encounter continued, the officers obtained greater suspicion, justifying greater police interference. *Id.*

¶35 Smith was parked not on a rural highway with his hazards on but in a parking lot of an establishment open for business. And though it was late at night, that fact alone cannot prompt legitimate concern for someone's well-being. *See Gentles v. State*, 50 So. 3d 1192, 1199 (Fla. Dist. Ct. App. 2010) ("[T]he fact that a motorist is asleep in his car with the motor running in an empty parking lot at night does not, without more, provide a reasonable basis for seizing the motorist."). As for the weather, there is no evidence of how cold the night in question was. But Smith had his engine running and was not far from an open McDonald's. The short of it is that being stranded on the side of a rural highway in freezing temperatures, as the majority

acknowledges, *supra* ¶ 18, is poles apart from being parked in a McDonald's parking lot with a visibly functioning car.

¶36 Moreover, the officers' response here did not grow side-by-side with their suspicion. Rather, the officers went in aggressively from the start. First Officer explained that he suspected "a possible DUI" and purposefully parked his vehicle behind Smith to block Smith's escape and "waited for other officers to arrive before [he] made contact with the driver." The officers did not, however, have any proof of a possible DUI until they approached Smith's car, smelling alcohol on Smith's breath as he opened his door. In addition, from the start, First Officer shined his spotlight into Smith's car in order to hold "the advantage over" Smith. Had one of the officers initiated a less drastic seizure, or even attempted a consensual encounter, he likely would have still discovered Smith's drinking. The officer's interference with Smith's liberty, however, would have been commensurate to growing levels of suspicion.

III

¶37 I do not suggest that a man asleep in his car in the middle of the night in a parking lot after being asked to leave raises no concern. But the issue here is whether the officers were checking on Smith's welfare or simply investigating crime. In *State v. Anderson*, 2015 UT 90, 362 P.3d 1232, the officers did not block the driver's exit, seek tactical advantages, or wait for backup before rendering aid to a stranded traveler on his way to Jericho. In contrast, the three officers here responded to a call from a McDonald's employee who, from all appearances, simply did not want Smith in the parking lot. And the objective facts show that the officers suspected a possible DUI for which they did not yet have individualized suspicion. The idea that the three officers were "concerned with Smith's well-being," *supra* ¶ 18, totally apart from the investigation of crime, while perhaps not "tax[ing] the credulity of the credulous," *Maryland v. King*, 569

U.S. 435, 466 (2013) (Scalia, J., dissenting), is still a bit too fanciful for me to accept.

¶38   The United States Supreme Court has limited the community caretaking doctrine to police functions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). The Utah Supreme Court's decision in *Anderson* does not change this. Its balancing test instructs us to ask whether the manner of an individual's seizure is justified by a perceived noncriminal danger—i.e., was the seizure reasonable under all the circumstances? *Anderson*, 2015 UT 90, ¶ 26. And, on balance, I think that the manner of Smith's seizure was unreasonable. I therefore respectfully dissent.

———————